[No. 30038. Department Two. March 14, 1947.]

KNAPP REFRACTORY ORE PROCESSING COMPANY, *Appellant*, v. IDAHO LAKEVIEW MINES COMPANY, *Respondent*.[1]

*Ralph A. Horr* and *Therrett Towles*, for appellant.

*Hamblen, Gilbert & Brooke*, for respondent.

JEFFERS, J.—This action was instituted by Knapp Refractory Ore Processing Company, a corporation (herein-

[1]Reported in 178 P. (2d) 304.

after referred to as Knapp), against Idaho Lakeview Mines Company, a corporation (hereinafter referred to as Idaho), in the superior court for Spokane county, about September 25, 1944.

The general basis of plaintiff's cause of action, as shown by its amended complaint filed October 25, 1944, is that defendant failed to mill and treat certain ores delivered by plaintiff to defendant, in accordance with a certain written contract made and entered into between the parties on September 11, 1942 (plaintiff's exhibit No. 1), and that, because of the inefficient milling and treatment of the ore, a substantial amount of the value of the ore was lost.

It is alleged by plaintiff that approximately seven hundred tons of ore was transported to defendant's mill, and that such ore had an assay value of thirty-five dollars per ton, and could be milled at a profit. It is further alleged that there is due plaintiff from defendant a substantial sum of money, the exact amount of which is unknown, because defendant has failed to account to plaintiff, as required by the contract.

The amended complaint is long and involved. It contains many alleged violations of the contract on the part of defendant, in that defendant did not mill and treat the ore in accordance with a flow sheet furnished by plaintiff; that it did not grind the ore to such a degree of fineness that it would go through an eighty mesh screen; that it had failed to furnish plaintiff with a daily mill shift report and other information to which it was entitled.

As a result of the many claimed violations of the contract on the part of defendant, this action was brought by plaintiff to compel defendant to produce its records for plaintiff's examination and inspection, and to account to plaintiff for ores, moneys, materials, and concentrates entrusted to its care and custody pursuant to the contract of September 11th.

The amended answer and counterclaims of defendant denied that defendant had breached the contract hereinbefore referred to. Defendant specifically denied that the ore transported to its mill by plaintiff had an assay value of

thirty-five dollars per ton, or any assay value in excess of from twenty to twenty-five dollars per ton, and specifically denied that any of the ore could be milled and treated at a profit.

As a first counterclaim, defendant alleged that, had plaintiff delivered to defendant's mill, for milling, treatment, and marketing, in accordance with the terms of the contract, fifty-five hundred tons of ore, defendant could have made a profit of not less than twenty thousand dollars, by reason of such milling, treatment, and marketing; that, by reason of plaintiff's failure to deliver such ore, defendant has been damaged in the sum of twenty thousand dollars.

It is alleged, as a basis for its second counterclaim, that defendant, at plaintiff's request, paid for work in connection with hauling ore and constructing ore bin, over and above certain credits for materials and supplies, the sum of $660.70, no part of which has been paid.

As a basis for its third counterclaim, defendant alleged that plaintiff delivered to defendant, for milling and treatment, 383 tons of ore, all of which defendant has milled and treated; that, of this amount, concentrates from 269 tons have been shipped to the smelter and settlement therefor received by defendant; that a detailed statement of the cost of milling and treating such ore, together with a charge of five dollars per ton, as provided in the contract, was furnished to plaintiff on January 10, 1944, and according to such statement, there is due and owing to defendant, over and above all credits and offsets, the sum of $2,457.49; that, since the furnishing of such statement, defendant has milled and treated the remainder of the ore delivered to it, to wit, 114 tons, and that the cost of milling, including the five dollars per ton charge provided for in the contract, amounts to a total of $719.55; that, as a result of the milling and treatment of the 114 tons of ore, defendant has on hand between four and five tons of zinc concentrate, and two or three tons of lead concentrate, which, on the basis of previous concentrates from such operations which have been shipped to the smelter, would return to defendant the sum of $50.18, less the expense of hauling amounting to $46.62, or a net return

to defendant of $3.56, as a credit upon the cost of milling and delivering the ore, leaving a balance of $715.99 due from plaintiff to defendant, or a grand total of $3,173.48 due from plaintiff to defendant for all ore milled, treated, and shipped.

Plaintiff's reply consists of some twenty pages, wherein is set out and reiterated, only in more detail, many of the allegations of the amended complaint. However, the reply denies and puts in issue the affirmative matter set out in defendant's answer and counterclaims.

We appreciate that, in view of the fact that the statement of facts comprises some 1,176 pages, it is an extremely difficult matter to present this case within the reasonable confines of an opinion. There are some eighty-seven exhibits, many of them lengthy and containing much phraseology which is technical and understandable only by one who has had at least some experience with mining and milling operations. There are pages of testimony in the record by men who claimed to be experts in mining and milling operations, relative to whether or not the ore which was delivered to defendant's mill could be profitably milled and treated by the methods employed by defendant, or in accordance with the flow sheet furnished by plaintiff to defendant.

The trial court gave to the case and the different contentions of the respective parties more time and thought than is possible in most cases. It heard oral argument at the close of the case. Written briefs were then submitted, after a consideration of which the court filed a memorandum decision. While this decision was favorable to defendant, the question of the amount of damages to be awarded to defendant on its counterclaims was left open for further discussion. A further hearing was had, and apparently the entire case was reargued orally and upon written briefs, after which the trial court made and filed a very full and comprehensive supplemental memorandum opinion.

When a decree was presented, at least some aspects of the case were reargued, and again upon plaintiff's motion for a new trial. The original and supplemental memorandum opinions indicate the time and thought which the trial

court gave to its consideration of the record, and that it considered all the controlling questions involved.

It is apparent that in this opinion we can discuss only what we consider the controlling questions and, in such discussion, refer to only parts of the evidence. As to the many other questions raised, all we can do is to check the record and see if there is substantial testimony to support the trial court's conclusions, as set out in the memorandum opinions and carried into the judgment. We do not desire to be understood as holding that the memorandum opinions have been considered as formal findings of fact or conclusions of law, but the conclusions reached by the court as shown by the memorandum opinions were in fact carried into the judgment.

For some years prior to the time with which we are here concerned, defendant had owned and operated a mining property known as the Hewer mine, and a small concentrating and flotation mill in connection therewith.

On August 25, 1942, plaintiff entered into a contract with Silver Leaf Mines Corporation (which contract is attached to the deposition of W. H. Latta as plaintiff's exhibit No. 33), whereby Silver Leaf agreed to sell, and plaintiff agreed to buy, certain mining properties in the Lakeview mining district, Bonner county, Idaho. Among the claims covered by the contract were Keep Kool No. 2, Keep Kool No. 3, Keep Kool No. 4, and Keep Kool No. 5. This contract provided that it was subject to a certain sale agreement dated July 24, 1941, between Keep Kool Mining Company and Silver Leaf Mines Corporation, which last-named agreement was referred to as the Keep Kool contract. Under the contract with Silver Leaf, Knapp agreed to pay two hundred fifty thousand dollars for the properties.

Under the contract between Keep Kool and Silver Leaf (plaintiff's exhibit No. 36), Silver Leaf agreed to pay $70,-901.65 for the properties covered by the contract.

Under the contract between Knapp and Silver Leaf (plaintiff's exhibit No. 33), Knapp was to assume and pay

the balance of the $70,901.65 due from Silver Leaf to Keep Kool, and agreed to make all payments due Keep Kool from Silver Leaf, and, in all respects, to comply with the agreement entered into between Keep Kool and Silver Leaf. Under the agreement between Keep Kool and Silver Leaf, the latter agreed to pay five thousand dollars on or before October 1, 1942, five thousand dollars on or before October 1 in the years 1943, 1944, 1945, 1946, and 1947, and the balance on or before October 1, 1948. The Keep Kool-Silver Leaf contract also contained a forfeiture clause.

Plaintiff was organized for the purpose of testing ores and working out formulas or flow sheets for the milling and treatment of such ores. It owned a laboratory and pilot plant in Seattle, where these different mill processes were developed. Prior to its acquisition of the Keep Kool mines, Knapp had never engaged in any mining or commercial milling operation.

Over a period of years preceding the time Knapp acquired the Keep Kool, several tunnels had been driven on the Keep Kool properties, and considerable ore had been removed. The ore so removed was known as sulphide and oxide ores, and several hundred tons of this ore had been removed from tunnel No. 5 and deposited on the dump at the portal of that tunnel.

As neither Keep Kool nor Silver Leaf had a mill capable of milling the Keep Kool ores, negotiations were entered into between the parties hereto, which culminated in the written contract of September 11, 1942. Prior to entering into this contract, Mr. Alexander, who was president and general manager of plaintiff, visited the Hewer mill, went over the plant, inspected the equipment, and suggested the addition of certain equipment, which apparently was furnished by defendant. Mr. Alexander seems to have been satisfied that the mill was equipped to do the work needed to be done in the milling and treatment of the ore to be delivered.

Many references will be made to the provisions of this contract, and we think it well at this time to set out some

of its provisions; then, when necessary in the discussion, a more particular reference will be made to the contract.

Knapp agreed to forthwith commence placing the Keep Kool mine in condition for the commercial mining of ore therefrom, and on or before sixty days after the date of the contract, to *mine* and *transport* to the Idaho mill, for treatment and milling, a minimum of *fifty tons per day* for *twenty days* in each calendar month.

"The mining and development of the Keep Kool mine shall be conventional and efficiently accomplished *on the existing ore bodies as disclosed in the No. 5 tunnel. . . .* Knapp agrees to make suitable provision for the weighing of all ore delivered to Idaho for milling hereunder (such ore) shall be of sufficient commercial value to cover cost of the mining and transportation thereof, (including) all charges payable to Idaho hereunder and smelter charges and royalty payments due with reference thereto.

"Knapp further agrees to forthwith construct according to the plans and specifications of Idaho and subject to its supervision, an ore bin of five hundred ton capacity for the Keep Kool ore, on the north side and at the elevation of the existing ore bin of the Idaho mill. The construction thereof shall be at the expense of Knapp but upon the termination hereof the same shall become the property of Idaho." (Italics ours.)

Knapp agreed to construct a road from the Keep Kool ore bin, the road to be constructed at the Idaho mill, to the existing road.

"Idaho agrees to forthwith improve its mill by the installation of *an additional set of cells, two conditioners* and sufficient additional power for the operation thereof. It is understood and agreed that said mill shall be placed in a good operating condition and insofar as is reasonably practicable with *said machinery* and *equipment* so as to comply with the *flow sheet* as prepared by Knapp for the milling of the Keep Kool ore. Knapp agrees to furnish without charge to Idaho, its metallurgist with reference to the placing of said mill in operating condition. . . .

"It shall be the obligation of Idaho to mill and treat the ore so delivered to it by Knapp and Idaho agrees to do so in a good and efficient manner and to at all times exercise due diligence relative thereto. It further agrees to furnish Knapp with a duplicate of the daily sample of the *heads*

and *tails* of the ore treated and milled, which shall be shipped to the laboratory of Knapp so that Knapp may currently check the same and advise Idaho as to the metallurgy of the ore being milled." (Italics ours.)

The last-quoted paragraph is No. 5 of the contract. On September 14, 1942, Knapp, by letter (defendant's exhibit No. 60), consented to a modification of paragraph No. 5 in the following particulars:

"It is understood it is your [Idaho's] obligation to furnish us with a duplicate of the daily sample of the *heads* and *tails* of the ores treated in the mill, and said obligation shall terminate upon delivery of same to us or our representatives *at the Hewer mine.*" (Italics ours.)

It may be stated here that it appears from the testimony that daily samples of heads and tails were taken and made available to plaintiff each day, but that plaintiff made no use of such samples for assay or other purposes.

The provisions of the contract continue:

"Knapp agrees to pay to Idaho for the milling and treatment of the Keep Kool ore as aforesaid and the marketing of the concentrates thereof, the sum of *$5.00 per ton of crude ore milled* and the actual *milling, treatment, marketing* and actual and direct administrative costs connected therewith. . . .

"Knapp, by agents and representatives, shall have the right to inspect the milling operations conducted hereunder at all reasonable and seasonable times during the life of this agreement, and shall be furnished with duplicate copies of all mint, mill or smelter returns or settlement sheets showing shipments of gold, silver and other precious and semi-precious metals and minerals from the said premises, which copies shall accompany the settlements between the parties. Knapp shall further have access to and shall have the right to inspect at all reasonable times all the books of account, documents and papers kept and maintained by Idaho in connection with said operation with reference to the amount of ore milled and minerals recovered from said properties, and all other proper facts in connection therewith." (Italics ours.)

We shall now proceed to discuss some of the testimony and exhibits in this case which, in our opinion, have a direct bearing on the judgment entered.

Earl A. McDaniel was employed by both parties to this action. According to Mr. Alexander, McDaniel was to give about one half of his time to the supervision of the mining operations, and the balance of his time to the supervision of the milling operations. On September 14, 1942, plaintiff wrote a letter to defendant (plaintiff's exhibit No. 6), the body of which we quote:

"This is to confirm our understanding and agreement that you [defendant] are in no way responsible with reference to the development by us of the Keep Kool mine, and that Earl McDaniel is acting solely and only for our company with reference to the mining operations and the transportation of ore, and you are in no way responsible for any of his acts performed for and on our behalf with reference thereto."

According to Mr. McDaniel's testimony, the first work was done in carrying out the terms of the contract the latter part of September, 1942, and the first ore was removed from tunnel No. 5 in December, 1942. Ore was removed until about the middle of January, 1943, after which no more ore was removed from the mine. Mr. McDaniel testified that one hundred twenty-five tons of ore was removed from the mine and was deposited along the side of the No. 5 dump; that only about sixty tons of this freshly mined ore was loaded and sent down to the Hewer mill. The other ore hauled to the Hewer mill was from the dump at the portal of tunnel No. 5, and had been taken from the mine some years previous to the time this mine was acquired by Knapp.

The first ore was hauled from the Keep Kool on August 4, 1943, and the last ore was hauled to the mill on September 23, 1943, or just a day or two after milling operations actually started; and, according to Mr. McDaniel, the mill operations stopped for 1943 on December 1st, at which time there was still about thirty or forty tons of ore in the bins, which could not be milled because it was too wet, due to the failure of Knapp to put a roof on the ore bin. This remaining thirty or forty tons was not milled until May, 1944.

It may be stated here that what the parties were pri-

marily seeking to obtain from the ore was zinc and lead concentrates. It appears from Mr. McDaniel's testimony that he was having trouble in milling the ore, and that, as a result of a conversation with Mr. Alexander, the latter contacted Lloyd E. Reeves, to whom we shall later refer, and brought him to the mill and introduced him to Mr. McDaniel. Mr. McDaniel operated the mill from September 23rd to October 12th, at which time Reeves was employed. However, McDaniel remained as superintendent.

In view of the fact that much is said in the record about sulphide ore and oxide ore, and the fact that the instructions accompanying the flow sheet stated that ten per cent oxide was the limit, and in view of the further fact that the trial court stated in its memorandum opinion:

"Under all the circumstances as shown by the evidence, it is my conclusion that inadvertently more than ten per cent oxide ore became mixed with the sulphide in removing the ore from the dump [at the No. 5 tunnel portal], and that this condition was responsible for the failure to obtain commercial *quantities* of concentrates from the ore under the Knapp flow sheet," (Italics ours.)

let us examine the record to see what is meant by the terms sulphide ore and oxide ore.

Royal S. Handy, called by defendant, is a metallurgist of many years experience. He had worked with many kinds of minerals and metals in all parts of the United States and in many foreign countries. At the time of this trial, he was a man sixty-four years of age. He had been with the Bunker Hill & Sullivan plant since 1905, working in many capacities. In 1910, he became mill superintendent and continued in that capacity until 1941, when he was placed in the category of consulting metallurgical engineer. In the laboratory of the Bunker Hill, he had worked out a process for treating many difficult kinds of minerals and metals. Apparently the trial court, to a considerable extent, relied upon Mr. Handy's testimony in regard to many of the technical questions which were presented in this action.

It is apparent, from the following statement of Mr. Handy, that sulphide ore and oxide ore do not respond to

the same treatment for the purpose of obtaining the minerals contained in such ore.

"A. Now, in a sulphide ore your minerals are combined with sulphur; that is, you have the lead sulphide, copper sulphide, zinc sulphide, but in an oxide ore you have iron oxide, *lead carbonates*, zinc carbonates, and those are different minerals entirely. A *lead carbonate* or a cerussite is an entirely different mineral from the *lead sulphide or galena*, and they react entirely different to re-agents and, in fact, *all mechanical processes or applications*. Q. What do you say as to the comparative difficulty, then, of separating and recovering lead and zinc minerals that are in a sulphide ore as compared with an oxide ore? A. Well, in a sulphide ore you can put oil in, as I just illustrated, and the *lead sulphide* will coalesce with the bubble and rise to the top and can be taken off. If you had a *lead carbonate* with some lead content, the same lead assay in that pulp, and you would put oil in there to the same degree, the same agitation, all the conditions identical, your *lead carbonate* wouldn't coalesce with the bubble and wouldn't come to the top and couldn't be taken off. Q. Is this *lead carbonate* you spoke of a characteristic or element of this *oxide ore*? A. Yes." (Italics ours.)

It is apparent from the record that Knapp appreciated that ore containing more than ten per cent oxide could not be profitably milled and treated by its flow sheet, and that its process for milling and treatment was not intended to cover ore containing more than ten per cent oxide.

E. L. Gutberlet, a chemist and metallurgist of some years experience, was in the laboratory and pilot plant of defendant when the mineral from tunnel No. 5 was assayed and run through the pilot plant and the flow sheet was worked out for the milling and treatment of the ore to be taken from tunnel No. 5. This witness stated that they determined this ore had to be ground to at least eighty mesh, or, in other words, fine enough to go through an eighty mesh screen.

We may say here that plaintiff's main contention was and is that the reason the ore delivered at the mill did not produce concentrates of commercial value was that it was not ground or crushed to such an extent that it would go through

an eighty mesh screen, and, as a result, a considerable quantity of the ore went over as tailings and its value was lost.

Plaintiff's exhibit No. 14 is the flow sheet prepared by plaintiff after it had run twelve tons of sulphide ore from tunnel No. 5 through its pilot plant. We quote from Mr. Gutberlet's statement as to what this flow sheet shows:

"This is the result of—This is the assay of the heads, lead concentrates, zinc concentrates, tailings and a calculation as to the ratio of concentration that we arrived at on that run and the over-all recovery and the screen analysis of our *tailings, which was material going out which was lost,* and consequently would include the large particles. It states here the re-agents [any substance which, by reason of its capacity for taking part in certain reactions, is used in detecting, examining or measuring other substances, in preparing material] used in the flotation process and where we added them and the Ph of the two circuits [lead circuit and zinc circuit]; that is, the alkalinity of the lead circuit and the zinc circuit." (Italics ours.)

It may be noted that Mr. Alexander stated that concentrates obtained by plaintiff as the result of running the twelve tons of sulphide ore through its pilot plant were sent to the smelter, and the report from the smelter indicated that the sulphide ore milled and treated in accordance with plaintiff's flow sheet, or process, would produce a sufficient amount of concentrates per ton of ore milled to justify the cost of such milling and treatment.

Although admitting that, if the ore delivered by plaintiff to the Hewer mill had been the same kind of ore as that used by plaintiff in making its flow sheet at its Seattle plant, it would have produced concentrates in sufficient quantity and of sufficient value to justify such milling and treatment, we are of the opinion, as was the trial court, that the same kind of ore was not actually delivered to defendant's mill as was run through plaintiff's pilot plant, upon which plaintiff's flow sheet was based. This conclusion of the trial court was based upon the testimony of several witnesses, among them Mr. Handy.

The milling and treatment of the ore after it had been dumped in the ore bins at the Hewer mill were described by Mr. McDaniel, plant superintendent, in substance as fol-

lows: The ore is first carried on a conveyer from the ore bin to a crusher, where the large lumps are crushed and reduced to a similar size. The ore then goes to the rollers, which are large, heavy, metal rollers. All the ore goes between these rollers, which crush the pieces of ore to about a quarter or three eighths of an inch. From the rollers, the ore goes to what is termed the fine ore bin, which holds about one hundred tons and is located inside the mill. This ore, known as mill feed, then goes from the fine ore bin to the ball mill, and it is from this mill feed that samples of heads are taken. The purpose of the ball mill is to grind the ore still finer. A ball mill is a cylindrical shell and, in this particular operation, was about one-half full of round iron balls, weighing three and one-half pounds. Water and a certain amount of reagent are introduced into the ball mill, and the revolving of the cylinder causes the iron balls to grind the ore still finer. When the ore emerges from the ball mill, it is like mud, or pulp, and is called ore pulp. In this plant, there were two ball mills.

The ore pulp goes from the ball mill to the classifier. Plaintiff's exhibit No. 15 shows a cut of a classifier, which is like the one used in this mill. As near as we can determine from Mr. McDaniel's testimony and from an examination of exhibit No. 15, and other testimony, the mass in the classifier is agitated by what is described as rakes, and the ore which is not ground fine enough is separated and returned to the ball mill for further grinding. The theory of the grinding is to separate as far as possible the mineral from the waste, or, as it is termed in mining, the gangue.

In this particular operation, the next process is to separate the lead particles from the zinc and then to obtain the zinc particles. In order to accomplish this result, two flotation operations are necessary. First, the pulp is introduced into what is known as a lead cell, or tank. The pulp comes in through a hole in the bottom of the tank. In the tank is an agitator, in the shape of a fin, which stirs up the pulp. Certain chemicals or reagents which tend to separate the lead from the zinc are also put in this tank. Air is introduced into the bottom of the tank with the pulp, and the air,

together with the reagents, create a froth. This froth, which is in fact air bubbles, rises to the top, and as it rises it collects and carries with it the lead particles to the top, where they are scraped off with a mechanical wiper. The zinc particles are left behind. The lead particles, after being scraped off, are dried and become what is known as lead concentrates, and are then ready to go to the smelter.

It is now necessary to obtain the zinc particles which have been depressed and left in the lead cell. It is important that the zinc be separated from the lead, for the reason that the smelter penalizes for an excess of zinc in lead concentrates, and also, the price of the zinc is lost. The Bunker Hill exacts this penalty when the lead concentrates contain more than ten per cent zinc. Nothing is received for the zinc contained in the lead concentrates.

After the lead particles have been skimmed off in the lead cell, the pulp is then run into a zinc cell, where, by means of reagents and oil, the zinc particles are floated to the top, removed and dried, and become zinc concentrates.

It is very apparent from the record that different ores require different methods of treatment, in order to recover their values, and that a flow sheet adaptable to extract a certain kind of mineral from the waste and other minerals will not obtain good results, where the ore attempted to be milled and treated is different from that upon which the flow sheet is based.

Many pages of testimony in the record are devoted to a detailed description of different parts of this milling process, and of the results hoped to be obtained by following any milling and treatment process. Different experts testified as to the effect of different reagents used as aids in obtaining the desired minerals, and stated that often the flow sheet, or method by which the ore is to be milled and treated, has to be changed in certain particulars in order to obtain the desired results. We have read this testimony and examined the reports and other exhibits, and we are of the opinion that, in view of the conflict in the evidence, it cannot be said that the trial court's conclusions, as shown by its memo-

randum opinions and the judgment entered, were not amply supported by the evidence.

In the instant case, the evidence shows that the net returns from concentrates shipped by defendant to the smelter at Kellogg, Idaho, was only $5.97 per ton of ore milled. It is apparent that this sum is not sufficient to pay the five dollars per ton of crude ore milled, together with the actual milling, treatment, marketing, and administrative costs.

The decree entered by the trial court provides:

"It Is Ordered, Adjudged and Decreed as follows:

"1. That the Idaho Lakeview Mines Company, a corporation, do have and recover from the plaintiff Knapp Refractory Ore Processing Co., a corporation, the following sums for and on account of the several matters herein mentioned, that is to say:

> (a) On account of 533 tons milled by defendant at the contract rate of $5 per ton, the sum of $2665.00, and on account of milling costs for milling said ore after crediting net smelter returns of $1052.91, the sum of $1156.48, making a total of.......................... $3,821.48
> (b) For and on account of balance due defendant covering items other than for milling, the sum of............. 175.52
> (c) On account of damages for failure to deliver to defendant's mill for milling as per contract, 840 tons of ore at $5.00 per ton, the sum of..................... 4,200.00

> Making a total due as set forth in paragraph (a), (b) and (c) hereof, the sum of.................... $8,197.00

"2. That plaintiff is entitled to recover from the defendant as an offset to the amounts due defendants as set forth in paragraph 1 hereof, the following amounts:

> (a) For additional recovery as to quantity and quality of concentrates for failure of the defendant to mill plaintiff's ore efficiently, 599.63, and value of concentrates in the possession of the defendant but not shipped to the smelter, 500.18, the sum of.............. $1,099.81
> (b) For use of plaintiff's car, less allowance for meals, the sum of ........................................ 152.50
> (c) For use of plaintiff's truck.......................... 174.05
> (d) For value of scales (title to which shall vest in defendant) ........................................ 225.00

> Total offsets ................................. $1,651.36

"3. That the defendant do have and recover from the plaintiff on account of the items mentioned in paragraph 1 hereof, less the offsets allowed plaintiff as set forth in

paragraph 2 hereof, the sum of $6,545.64, together with interest thereon at the rate of 6% per annum from August 12th, 1944.

"4. That plaintiff take nothing by its complaint herein other than the offsets above allowed and that the defendant do have and recover from the plaintiff its costs and disbursements herein to be taxed."

A motion for new trial was made by plaintiff and denied by the court. Plaintiff has appealed from the judgment entered.

Appellant's assignments of error are:

"1. In making and entering as a part of judgment and decree in favor of respondent and against appellant sum of $3,821.48, or any sum whatever, as due upon respondent's third counterclaim.

"2. In making and entering as a part of judgment and decree in favor of respondent and against appellant sum of $175.52, or any sum whatever, as due upon respondent's second counterclaim.

"3. In making and entering as a part of judgment and decree in favor of respondent and against appellant sum of $4,200, or any sum whatever, as due upon respondent's first counterclaim.

"4. In making and entering judgment and decree in favor of respondent and against appellant in sum of $6,545.64, and interest, or any sum whatever, as due to respondent by appellant in said accounting as set forth in said judgment and decree.

"5. In overruling appellant's motion for new trial."

Appellant contends, under point three of its brief, as follows:

"Failure to grind ore to an 80 mesh by complying with contract and following flowsheet was, we contend, not only *the main reason but the controlling cause* for respondent not milling appellant's ore at a profit, coupled with improper mechanical functioning of mill, its negligent and inefficient operation caused by incompetent and inexperienced mill operators, failure to keep necessary records each day in mill, and poor condition of mill and its equipment. It was not due to presence of any oxide ore in mill feed." (Italics ours.)

The trial court, as hereinbefore shown, did not agree with appellant's contention.

There is no question in our minds but that the parties, as indicated by their contract, contemplated that the ore to be milled and treated by respondent would be fresh ore taken from tunnel No. 5, and not from the old dump at the entrance to No. 5 tunnel. It is undisputed that, of the five hundred thirty-three tons of ore which the trial court found was delivered to respondent's mill and milled by respondent, only one hundred twenty-five tons was actually mined by appellant, the balance of the ore having been scraped up from the old dump at the entrance to No. 5 tunnel.

It is admitted by appellant that at least a portion of the old dumps at the portal of tunnel No. 5 were oxidized dumps; that some of the ore in the dumps came out of the oxidized zone; that it was material which had to be taken out to get to the sulphide zone. At the time appellant began its operation, the tunnel in No. 5 had gone through the oxide zone.

Frank Boyles, who was employed with others to take out of tunnel No. 5 the twelve tons of ore which was run through appellant's pilot plant in Seattle and upon which appellant's flow sheet was based, is a miner and was familiar with ores in the Lakeview district. This witness stated:

"Q. What kind of ore was it? A. Good ore. Q. You say good ore. How would you designate it as to being sulphide ore or oxidized ore, or what? A. It was sulphide."

According to Mr. Boyles, as the ore was taken out of the mine it was dumped on a platform. Mr. Boyles was present and assisted in loading the ore on the trucks from the platform, as it was taken to appellant's plant in Seattle. The witness stated that he knew oxidized ore as distinguished from sulphide ore, and it seems apparent from the record that oxidized ore is distinguishable from sulphide ore by the color. From Mr. Boyle's testimony, it would seem to be a logical conclusion that the ore hauled to appellant's Seattle plant was freshly mined sulphide ore.

Mr. Boyles also stated that he was working for respondent when ore was taken from the dump at the portal of No. 5 tunnel and hauled to the Hewer mill; that he was loading the trucks; that he helped load about fifteen trucks;

and that at least half of the ore loaded was oxidized ore from the old dump.

Lloyd E. Reeves, to whom we have hereinbefore referred, who had had experience in milling and smelter work in the Coeur d'Alene district, and who had been working for the Bunker Hill, went to work for respondent on October 12, 1943, and took over his duties at the mill on the following day, continuing to work for respondent until December 11, 1943, which was shortly after the mill operations had ceased for 1943. This witness stated he was first consulted by Mr. Alexander about going to work at the Hewer mill; that Mr. Alexander made the arrangements as to his pay, etc., and told him his position at the mill would be that of mill operator. Mr. Reeves was introduced to Mr. McDaniel by Mr. Alexander, who said to McDaniel: "Here is the man I picked up to take over the mill operating." It appears from a letter written by Mr. Alexander to respondent on December 4, 1943 (defendant's exhibit No. 62), which, it will be noted, was after the mill operations had ceased for 1943, that Mr. Alexander considered Mr. Reeves a good operator and a skilled mechanic.

When Mr. Reeves took over the mill operations on October 13th, he was given the flow sheet furnished by appellant and told by Mr. McDaniel to follow it as closely as he could. Mr. Reeves stated that, after he got the mill started, using appellant's flow sheet, he encountered difficulty, in that he got a high zinc contamination in the lead concentrates; that it was impossible for him to make a complete segregation between the lead and zinc contents in the lead circuit, and therefore the lead concentrates carried a large percentage of zinc. He testified:

"Q. How high was your contamination running? A. Well, I don't know just what the highest was, but I know some of it was as high as twenty or twenty-two percent contamination. Q. Did that condition continue for any length of time? A. Well, more or less. I wouldn't say that it run those exact percentages, but I would say that it was contaminated practically throughout the entire operation. . . . Q. Before I go into that, I want you to tell the court whether you noticed the character of the mill feed, as to what kind of ore

composed it? A. Yes, I did. Q. Tell the court just what you observed from time to time. A. Well, this mill feed coming from the fine ore bin to the ball mills was pretty much oxidized ore. Q. Would you be able to say about what percentage? A. Well, I had studied that some when it was coming through there, and I estimated it at not less than twenty percent."

Mr. Reeves also testified:

"Q. What did you say as to the quality of the lead concentrates that were produced there? A. I would say that they were of a low quality."

Also:

"Q. Did Mr. Alexander during any of that time make any complaint to you about the way you were operating the mill? A. He did not."

Mr. Reeves further stated that there was very little difficulty in the operation of the mill itself, that is, as we understand it, the mechanical part of the mill.

It appearing that respondent was not obtaining concentrates of the anticipated value, appellant sent in a metallurgist named Mattis to check the mill operations for the purpose of suggesting something which might make it possible to obtain better results. Mr. Reeves' testimony continues:

"Q. Did you have any talk with Mr. Mattis about the flow sheet? A. About the flow sheet? Yes, I did. Q. What did he say about it, or whether it would work? A. Well, I and he were in the bunkhouse there one night, talking— [Objection by counsel for appellant, which after argument was overruled.] A. Well, as I started to say, up in the bunkhouse there, Mattis and I was in the bunkhouse there at the Idaho Lakeview and we was talking concerning this flow sheet, and I said, 'I have exhausted my theories.' I said, 'Have you anything to offer on this flow sheet?' He said, 'the only thing I can suggest is that you keep making changes and checking the results and see if you can figure out a re-agent combination that will comply with this particular ore.' "

Mr. Reeves thought that Mr. McDaniel, Mr. Alexander, Mr. Mattis, Leo Demers, George Russell, and himself were present when Mr. Mattis made the above statement.

Mr. McDaniel testified that Mr. Alexander was present at the mill when some of the oxidized ore from the old dump was loaded and taken to the mill; that the witness and Mr. Alexander discussed the question of whether or not they could treat this ore from the dump and get a value out of it; and that Alexander told him their flow sheet would do it. This witness testified that Mr. Gutberlet, to whom we have previously referred, was at the mill for two days and made some assays, and was around the mill looking over the operations. Mr. McDaniel testified:

"Q. Did he [Gutberlet] make any suggestion to you as to what should be done to improve the operation? A. No, he didn't. He agreed with me that there was something wrong, that it wasn't working right. We knew that. Q. Did he make any comment to you about this Knapp flow sheet that you followed? A. Yes, he did. He told me that it wouldn't work, that was very evident. Q. He told you that? A. Yes, he thought that we should get a different system of re-agents. The only suggestion that he did offer on it was to go to Wallace and find out what they did up there with the same type of ore."

On cross-examination, Mr. McDaniel was asked:

"Q. Where did you get this idea that you saw fifteen to twenty percent oxide ore going through the mill? Where did you get that? A. From my observation of the classifiers in the mill. Q. How could you tell, or if there is a particle of ore going through, how could you estimate at any time during that run what percent is oxidized and what percentage is sulphide? A. You would estimate it from what I saw in the dump. Q. Then you didn't get it in the classifier, did you? A. Yes. It came through the classifier and it was strong enough that it discolored the water."

George Russell, who had followed mining most of his life, and who was familiar with ore and knew the difference between oxidized and sulphide ore, testified that he was at the Keep Kool mine when they were hauling ore from the dump to the mill, and assisted in the loading of the ore. This witness stated that some of the oxidized ore was loaded into the trucks.

"Q. What part of the ore that you loaded there into the

trucks would you say was oxidized ore; just your best estimate?"

to which the witness answered: "It looked to me like about twenty-five or thirty percent."

This witness also testified that he was in the bunkhouse when Mr. Mattis, referring to the operation of the mill, made the statement that the only thing they could do was to keep on experimenting until they found the right combination.

Leo A. Demers worked at the Hewer mill from the time they started until they closed down. He testified:

"Q. In what capacity were you working in the mill? A. I was a helper around there, taking care of the ball mills and the feed and the re-agents."

At that time, Mr. Reeves was the mill or flotation operator. Mr. Demers took samples of the mill feed approximately every hour. This witness stated that at different times he saw going through the mill ore which he judged to be between fifteen and twenty per cent oxidized. This witness also heard the statement made by Mr. Mattis in the bunkhouse, heretofore set out. He also testified that, while Mr. Mattis was there, he (Mattis) slowed down the classifier and speeded up the ball mills; that Mr. Mattis was at the mill about five days and obtained some better concentrates while he was there.

It should be kept in mind that Mr. Alexander was at all times insisting that his flow sheet be followed.

We again desire to call attention to the testimony of the metallurgist, Royal Handy, to whom we have hereinbefore referred, and of whom the trial court stated:

"Mr. Royal S. Handy, an outstanding metallurgical engineer, who had a splendid background of practical experience with the Bunker Hill & Sullivan Company in charge of milling operations and as consulting engineer with other mining companies in this country and South America and England, testified to the presence of oxide ore in the composite sample of the daily samples of heads and tails."

It will be remembered that samples of heads and tails were taken each day during the time the mill was operating. Mr. McDaniel took composite samples of these heads and tails to Mr. Handy. To explain a little more definitely, Mr. McDaniel took a certain amount of each daily sample, as it had been taken during the operation, mixed these together, and thus obtained a composite sample of all the ore which had been run through the mill. It was these composite samples which he took to Mr. Handy. The latter made a test of these samples in his laboratory, where he had a flotation machine, grinding mills, filters, and all the apparatus which is essential to make a laboratory test.

Mr. Handy stated that Mr. McDaniel left with him the composite samples, together with the Knapp flow sheet; that he was requested to test the ore, using the Knapp formula, and that he proceeded to make such a test in the Bunker Hill laboratory. Mr. Handy made up a table (defendant's exhibit No. 83), showing the result of his test using the Knapp flow sheet. In making his test, Mr. Handy used 1,500 grams, or 3.3 pounds, which he considered adequate. We now quote from his testimony:

"Q. Now, to get in language that a layman may understand as to what these results indicate, I will ask you to tell us what you found in respect to the froth that was developed by this flotation procedure. A. Well, the froth was voluminous and it contained an excessive amount in my judgment of zinc mineral. The zinc mineral floated very readily and a high percentage of the zinc mineral appeared in the lead froth, in the froth from the lead section. [It will be remembered this froth is what is skimmed off to obtain the lead particles at the completion of the flotation process.] Q. Is that a characteristic, would you say, of oxidized ore? A. I think it is, of this type of oxidized ore. Q. In the Knapp flow sheet, how many times was the lead concentrate and the zinc concentrate cleaned? A. The specifications called for two cleanings. Q. Did you give it two cleanings? A. Yes. Q. Was that sufficient in your opinion to produce a clean product? A. *Not on this ore.* It didn't. After two cleanings the lead concentrate contained 22.5 percent of zinc by assay, which is not a clean product. Q. What would you say, Mr. Hardy, after making this test and knowing the results, as to whether this Knapp procedure as indicated

in the flow sheet, or the procedure that was given you, was the correct method for treating the ore, a sample of which was submitted to you? A. *I think it was incorrect.* In the matter of the use of Xanthate it called for an excessive amount of Xanthate, which activated the zinc mineral and brought it up in the lead concentrate. Q. What is the purpose of that Xanthate? A. Xanthate is used to activate or condition a mineral to encourage it to float. Q. Now, having tested this ore as you have described it, what is your opinion as to whether the ore that you tested was of the same type and character as the ore showed to be tested under the Knapp flow sheet or procedure? A. *My opinion is that it was different ore,* because in the Knapp procedure the application of these re-agents did not activate the zinc mineral excessively; that is, after two cleanings in the Knapp procedure on the ore that they tested, the lead concentrate contained, I believe, 6.9 percent zinc, whereas after two cleanings on this ore the lead concentrate contained 22.5 percent zinc." (Italics ours.)

Mr. Handy also carried his analysis to the point of showing the recovery in dollars and cents from a ton of ore of the same type or content when the Knapp flow sheet was applied. Defendant's exhibit' No. 84 shows the result of Mr. Handy's analysis, and, without going into detail, it shows that the best possible economic recovery per ton which could be expected from such ore would be $5.9769 per ton.

Mr. Handy further testified that he went from the top to the bottom of the Hewer mill, inspecting it, and it seemed to him that the mill was fairly standard.

"Q. Now, Mr. Handy, just one more question, I think. I will ask you, in your opinion, based upon tests that you have made and described, if that were mill feed, the composite sample made of the mill feed, the composite sample of the tailings, and the results shown had been accomplished in the milling of this ore, to what would you attribute the failure to get better results? A. I attribute the failure to get better results in the mill to this unfortunate condition that existed in this particular ore, in which the minerals, the fine minerals, were involved or included in these gelatinous masses, in which it was impossible to segregate the various minerals. It is very difficult to segregate them; practically impossible. BY MR. HORR [attorney for appellant]: You

mean difficult, not impossible? A. *I would say that under the conditions it was impossible, mechanically, to segregate these mineral particles.* That is my judgment. . . . By Mr. GILBERT [attorney for respondent]: Now, this further question: In your opinion, then, was this Knapp milling procedure or flow sheet or re-agent schedule that was submitted to you adapted to the treatment and milling of this ore successfully? A. *I don't think that that procedure could possibly have segregated these minerals and produced a clean concentrate and a clean tailing; that is, a tailing free from commercial minerals.*" (Italics ours.)

Mr. Alexander testified to the effect that only sulphide ore was taken from the dump. Mr. Gutberlet testified that he saw no evidence of oxide ore being taken while he was there, and Mr. Stenstrom, an engineer who visited the mine in May, 1944, stated that he could see no evidence of oxide ore having been removed from the dump.

It is apparent, as stated by the trial court, that there is a conflict in the evidence as to whether or not the ore delivered to the mill contained more than ten per cent oxide ore.

We have heretofore set out the consideration given by the trial court to this case. Our study of the record convinces us there is ample testimony to support the following statement made by the trial court in its memorandum opinion, which we have hereinbefore quoted, and with which we are fully in accord:

"Under all the circumstances as shown by the evidence, it is my conclusion that inadvertently more than ten percent oxide ore became mixed with the sulphide in removing the ore from the dump, and that this condition was responsible for the failure to obtain commercial *quantities* of concentrates from the ore under the Knapp flow sheet." (Italics ours.)

As stated in the court's memorandum opinion, appellant contended that the failure to grind to eighty mesh was primarily responsible for the poor results obtained. Much reliance is placed by appellant upon the fact that Mr. Mattis, who it will be remembered was sent to the mill by appellant, and who was there five days, obtained a better *quality* of concentrates than had been gotten before.

The contract called for an eighty mesh grind, and there is evidence in the record that a certain amount of the ore was not ground to eighty mesh. The trial court concluded that only eighty-five per cent of the concentrates which could have been recovered under the condition of the ore milled by a strict adherence to the eighty mesh grind was actually recovered, and that, for the purpose of this accounting, an additional fifteen per cent should be added to the concentrates.

While our examination of the record convinces us the court's allowance of an additional fifteen per cent was extremely liberal, there is testimony to support the court's conclusion, and we are inclined to accept the court's figures. However, after allowing this fifteen per cent, the ore milled did not produce a *quantity* of concentrates in proportion to a ton of ore milled and treated of sufficient commercial value to pay the costs, as provided for in the contract, and, as stated by the trial court, the failure of the milling process to produce commercial concentrates was on account of the Knapp flow sheet not being adapted to the conditions where the oxide ore was present, although a slightly better recovery and an improved concentrate would be obtained by adhering to the eighty mesh specifications. The court allowed appellant an offset for this fifteen per cent against the sum due respondent for milling expense and the fixed sum of five dollars per ton.

Many questions are raised by appellant relative to the inefficient methods employed by respondent in its milling process. We do not think they are entitled to much weight, in view of the following testimony of Mr. Alexander, who, it will be remembered, was president of appellant company, had had training in Columbia University in chemical and mechanical engineering, had taken considerable work in the University of Washington in mining and chemical engineering, and, as he testified, had had about thirty years experience in engineering and mining.

"Q. Well, in any event, in due season and after a good many delays on both sides, the mill was put in operation on the Keep Cool ore, wasn't it? A. Yes, sir. Q. And it soon

developed, did it not, that certain difficulties were being encountered? A. What kind of difficulties? Q. Well, you have mentioned certain difficulties in the milling of that ore. A. *The only difficulty that I saw in the milling of the ore was the grinding of it.* Q. Well, you did realize, then, early in the operation; as you say, that the ore was not being ground so as to pass through this eighty mesh screen? A. That is right. Q. You noticed that right from the beginning? A. That was the first thing that I was after. Q. *And you regarded that as the most important thing?* A. *Absolutely.* Q. And if the operation has failed, as we, I think, all agree that it has, in making the recoveries, you would attribute this failure very largely to the fact that the ore was not ground to sufficient fineness? A. *That is right.* Q. Am I correct in that? A. Yes, that is right. Q. And you are sure about that? A. *That is the only thing that I was complaining about."* (Italics ours.)

It is contended by appellant that respondent failed to account to appellant and failed to furnish it with reports, as required by the contract.

The testimony and exhibits convince us, as they did the trial court, that respondent tried in every way to co-operate with appellant. The records and books kept by respondent were open at all reasonable times to appellant, and while some of the daily mill reports may not have been as full and complete as they might have been, we are satisfied that the books and records kept by respondent and made available to appellant were sufficient to enable appellant to determine the costs of the operation and the other facts which appellant was entitled to know.

At this point, we quote from the trial court's supplemental memorandum opinion:

"It is contended as a defense that defendant failed to account to plaintiff as provided in the contract. I have gone over all the correspondence relating to the accounts, and while there was some delay in plaintiff getting certain detailed information that it wanted, it appears from the evidence that defendant was endeavoring to cooperate with the plaintiff in that regard. Some of the information requested referred to plaintiff's own operation and was not in defendant's possession. Without extending this opinion further by detailing the various letters that passed between

the parties, defendant offered in its letter of December 9, 1943, plaintiff and its accountant access to its books and records and to cooperate with them. In subsequent letters plaintiff was invited to go over the accounts with defendant and adjust any discrepancies. Although the mill shift reports were not brought to Spokane from the mill until after the pre-trial hearing, they were available to plaintiff at the mill. Likewise, the evidence shows that the books and records of defendant at its Spokane office were available to plaintiff as provided in the contract."

Criticism of Mr. McDaniel and Mr. Reeves is made by appellant, but it will be recalled that Mr. McDaniel was employed by both appellant and respondent, and Mr. Reeves was employed by respondent very largely on the recommendation of Mr. Alexander, who, in December, after the operations for 1943 had ceased, stated in a letter to respondents that he considered Mr. Reeves a good operator.

Criticism is also made of the test made by Mr. Handy, because of the small quantity of ore tested. The testimony and exhibits bear out the following statement made by the trial court in regard to this test:

"However, as pointed out previously, it was a test used by Bunker Hill & Sullivan mill and recognized as a standard test. Furthermore, duplicate daily samples of the heads and tails were delivered to the plaintiff at the mill upon its request, but no effort was made to show that they did not contain oxide ore, nor were any tests made to demonstrate that the particular ore delivered to the mill could be successfully milled under the Knapp flow sheet."

In regard to respondent accepting and milling the ore from the dump, which it may be admitted McDaniel knew contained oxide ore, the trial court had the following to say in its supplemental memorandum opinion:

"Plaintiff contends that defendant was charged with the duty not to accept ore containing in excess of ten percent oxide ore and that the responsibility should be placed on the defendant because the metallurgical data (plaintiff's exhibit 29) furnished defendant states such ore could not be successfully treated by plaintiff's flow sheet.

"Assuming the defendant was charged with knowledge that the ore delivered to the mill contained more than ten percent oxide ore, the plaintiff would likewise be charged

with the same knowledge, as McDaniel was the employee of both parties. Furthermore, Mr. Alexander directed that the ore be hauled from the dump and was present either at the dump or the mill during the time the ore was hauled. Mr. McDaniel testified that he questioned Mr. Alexander about taking the ore on one occasion while it was being slushed and he said their flow sheet would handle it.

"Under the circumstances it would be inequitable to shift the responsibility entirely from plaintiff onto the defendant and force the latter to account for the amount which plaintiff expected to recover from the milling of sulphide ore under its flow sheet."

We quote again from the supplemental memorandum opinion:

"Regardless of the value of the ore the evidence established that *recovery* in commercial *quantities* could not be made under the *flow sheet* from the ore that was delivered. Inasmuch as defendant was not authorized to deviate from the flow sheet, it cannot be held responsible for such failure." (Italics ours.)

In arriving at the judgment entered, the court concluded there had been 533 tons of ore milled by respondent, for which, under the contract, it was entitled to recover five dollars per ton, or $2,665; that, in addition to the five dollars per ton, respondent, under the contract, was entitled to collect the actual milling, treatment, marketing, and administrative costs connected therewith. The records show a net smelter return to respondent of $1,052.91. In addition to the five dollars per ton above referred to, the court allowed as milling costs, after crediting the sum of $1,052.91, net smelter return, the sum of $1,156.48, making a total of $3,821.48.

Respondent claimed, on account of money paid at appellant's request for labor and materials other than milling, the sum of $660.70. However, the trial court was of the opinion that, as to this claim, after allowing appellant credit for certain items, there was a balance of only $175.52 due respondent.

The sum of forty-two hundred dollars allowed respondent was for appellant's failure to deliver the quantity of ore

provided for in the contract, which the court determined to be eight hundred forty tons in addition to what was actually delivered. Appellant attempted to excuse its failure to make delivery in accordance with the terms of the contract, on the ground that there was a shortage of manpower, which prevented the hauling of ore and reduced the operation of the mill to one shift. The trial court was of the opinion that the evidence showed that an arrangement was made to utilize employees of respondent, which was willing to co-operate with appellant in the mining and delivery of the ore. However, the court concluded, as shown by the supplemental memorandum opinion, that, inasmuch as the mill, on account of the shortage of labor, ran only one shift, the amount of ore which appellant was required to deliver under the contract should be reduced.

We are convinced, from a reading of the record, that it was not a shortage of manpower which was the cause of appellant's failure to deliver the amount of ore called for in the contract, either in 1943 or 1944, and we are in accord with the conclusion of the trial court that appellant breached the contract, in that it failed to deliver 840 tons of ore. Had this ore been delivered, respondent, under the contract, would have been entitled to five dollars per ton of crude ore for milling it, or $4,200. The items above mentioned make a total of $8,197, for which the trial court gave respondent judgment.

As an offset against the last-named amount, the court allowed appellant the sum of $1,099.81, for the additional fifteen per cent which the court concluded was lost by respondent not grinding the ore to an eighty mesh, and for the higher quality of concentrates which, as determined by the Mattis test, could have been obtained, together with a small quantity of concentrates still in possession of respondent, which had not been shipped to the smelter.

The court also allowed for the use of appellant's car, less allowance for meals for which appellant agreed to pay, $152.50, for use of appellant's truck, $174.05, and for the value of scales, $225, making a total offset of $1,651.36.

The questions presented in this case are, in our opinion, wholly questions of fact. There were very few objections made in the entire course of the trial. There was conflicting evidence in regard to much of the operation, but it is our opinion there is nothing in the record which conflicts with Mr. Handy's testimony, as hereinbefore set out, to the effect that a commercial recovery of concentrates, under the Knapp flow sheet, could not have been made from the ore delivered to the mill.

May we say frankly that a reading of the record convinces us that appellant did not have the financial backing to carry out its part of the contract. We are quite convinced that the real reason the ore delivered to the mill was taken from the dump and not actually mined was because of the great difference in cost. The testimony shows that it cost about $12.70 per ton to mine the ore, whereas it cost only a nominal sum to remove the ore from the dump.

It further appears from the testimony of Howard P. Sherman, supervising engineer in charge of the Reconstruction Finance Corporation in the Spokane area, among whose duties was that of receiving applications for mining loans, that appellant made application for and was granted a five-thousand-dollar preliminary loan. It was Mr. Sherman's understanding that the purpose of the loan was to enable appellant to get back to the ore in the No. 5 tunnel. According to this witness, there was no intimation that ore was to be taken from the old dump.

Mr. Sherman also stated that, at the time the loan was approved, no one from his office had visited the mine, but the loan was made entirely upon the information furnished by appellant. This loan, at the time of trial, had not been repaid.

It further appears that, on April 26, 1944, Keep Kool Mining Company prepared and had served on Silver Leaf, Knapp and Idaho a notice that the five-thousand-dollar payment due August 1, 1943, and the payment due October 1, 1943, from Silver Leaf to it, in accordance with the contract of July 24, 1941, which payments appellant, by its contract with Silver Leaf, had assumed and agreed to pay, had not

been made, and that unless the terms of the contract of July 24, 1941, were complied with, Keep Kool would, at the expiration of sixty days, enter upon and take possession of such mining claims. No payments having been made, the contract of July 24, 1941, was, by a notice dated January 9, 1945, declared forfeited.

While, of course, it is true that no notice of forfeiture was given until April 26, 1944, it is apparent that appellant had not made the 1943 payments which it was obligated to make by its contract with Silver Leaf and its contract with respondent.

After a consideration of the record, we are of the opinion there is ample evidence to support the judgment entered, and we are fully in accord therewith.

■ We have considered appellant's motion for new trial, and we are of the opinion the court committed no error in denying this motion. We are of the opinion no different result would be obtained if appellant were permitted to introduce the evidence which, by the affidavits in support of its motion, it indicates it could produce. In addition, we are of the opinion the affidavits do not show such evidence to be newly discovered evidence, and further, we are of the opinion such evidence would, at most, be only cumulative.

For the reasons herein assigned, the judgment of the trial court is affirmed.

MALLERY, C. J., STEINERT, ROBINSON, and HILL, JJ., concur.